# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

No. 13-30957

———————

January 16, 2015

Lyle W. Cayce
Clerk

PLAQUEMINES HOLDINGS, L.L.C.

Plaintiff - Appellee,

v.

CHS, INC.,

Defendant - Appellant.

—————————————

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:11-CV-3149

—————————————

Before JOLLY and JONES, Circuit Judges, and GODBEY[*], District Judge.

PER CURIAM:[**]

This appeal lies from a final judgment after a bench trial in a dispute regarding a servitude agreement. Because the district court correctly construed the servitude and sufficient evidence supports the court's fact findings, we affirm in most respects, with two minor exceptions.

---

[*]District Judge of the Northern District of Texas, sitting by designation.

[**]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-30957

## I. BACKGROUND

### A. Factual Background

Initially, the Ferruzzi conglomerate owned all of the real estate at issue in this dispute, including a 30.43 acre tract fronting on the Mississippi River with a grain elevator (the "CHS Property") and a landlocked inland tract (the "PH Property") adjoining the CHS Property where Ferruzzi's subsidiary, Mississippi River Alcohol Company, Inc. ("Missalco"), intended to construct an ethanol plant. There was to be synergy between the two operations because the corn stored in the grain elevator would be the feedstock for the contemplated ethanol plant. In 1994, Ferruzzi agreed to sell the riverside CHS Property to ConAgra, Inc. Because this would leave the PH Property landlocked, Ferruzzi required as a condition of the sale that ConAgra grant the PH Property a servitude allowing construction of a dock on the river and a pipeline from the PH Property across the CHS Property to the dock, so that the contemplated ethanol plant could deliver its ethanol to barges for transport. *See* TX 1, ROA.1391-95 (the "Servitude Agreement"). Construction of the Servitude Agreement is the core of this dispute.

At the time of the Servitude Agreement, the CHS Property included an existing dock that was used for unloading and loading grain to and from the

grain elevator on the shore. Unlike a fishing pier that might extend perpendicular to the river bank out into the river, CHS's dock is a structure out in the river that runs parallel to the river bank and is navigable on both sides. The Servitude Agreement designates an approximately 409 feet area adjacent to CHS's dock on the downriver side for construction of the PH Property dock (the "Servitude Area").

The CHS dock was used as follows at the time of the Servitude Agreement: Grain would arrive from upriver in barges. The barges would accumulate in an area downriver of the Servitude Area called the fleet. As barges were ready for unloading, they would be towed from the fleet, across the Servitude Area to the inboard, downriver side of the CHS dock. Personnel would remove the cover of the barge, and equipment would unload the barge as it proceeded upriver along the inboard side of the dock. After it was unloaded, at the upriver end of the dock personnel would replace the barge cover and the barge would be towed back downriver to the fleet area.

Defendant-Appellant CHS, Inc. ("CHS") is successor-in-title to ConAgra in the CHS Property. In approximately 2000, CHS constructed a structure – the barge cover station – on the downriver, inland side of its dock, adjacent to the Servitude Area. The barge cover station is two barges wide. As before, when a

barge was ready to be unloaded, it was towed from the fleet through the Servitude Area to the lane of the barge cover station closest to the dock, where the cover was removed. After the barge was unloaded, it was towed again through the Servitude Area to the second lane of the barge cover station, closer to the bank, where the cover was replaced. The barge was then returned to the fleet. While the barge traffic through the first lane was essentially the same as what had occurred before construction of the barge cover station, use of the barge cover station created the second transit of each barge through the Servitude Area into the second lane of the barge cover station. *See generally* ROA.1400-08, 1420-22.

Missalco and its successors were never able to complete the ethanol plant. Eventually, Plaintiff-Appellee Plaquemines Holdings, L.L.C. ("PH") bought the PH Property and its rights under the Servitude Agreement out of bankruptcy. PH has leased the PH Property to Omega Refining, LLC ("Omega") so that Omega can construct a facility to recondition motor oil, which would be delivered to and shipped from a dock constructed pursuant to the Servitude Agreement. PH and CHS have been unable to agree to a location for construction of a dock in the Servitude Area. This dispute followed.

No. 13-30957

## B. Procedural Background

PH initially filed this action in state court in 2011, seeking declaratory relief, injunction, and money damages. CHS timely removed the action to the federal district court below, invoking diversity jurisdiction. *See* 28 U.S.C. §§ 1332, 1441(a). The case was tried to the court for two days. Following the conclusion of the trial, with the consent of all parties, the court conducted a site visit. The district court initially ruled in favor, generally, of PH; PH moved to clarify, which the district court granted, entering an amended opinion, ROA.1952-75, and judgment, from which CHS timely appealed. PH did not cross-appeal.

The district court ruled that: (1) PH has the right to build a dock in the Servitude Area; (2) the outer edge of the new dock (i.e., closest to the center of the river) must be in line with the outer edge of the existing CHS dock; (3) CHS may not object to construction of a new dock on the basis of interference with its use of the barge cover station because the barge cover station was constructed after the Servitude Agreement; (4) CHS may not object to the use of the Servitude for motor oil refining; (5) PH's lessee, Omega, could use the Servitude Dock; and (6) if PH applies for a permit for the proposed dock with the Corps of Engineers, CHS may not object based on interference with the barge cover

5

No. 13-30957

station and must assist PH in the permitting process. The district court also ruled in favor of CHS on several issues, which are not involved in this appeal.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *Lehman v. GE Global Ins. Holding Corp.*, 524 F.3d 621, 625 (5th Cir. 2008) (quoting *In re Mid-South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)).

### *C. General Principles Regarding Servitudes*

All parties agree this appeal is governed by Louisiana substantive law. For those not familiar with the vocabulary of Louisiana civil law, "it is 'uniformly accepted in the law of Louisiana that the common law word 'easement' is the same as the Louisiana 'servitude.' '" *Rose v. Tenn. Gas Pipeline Co.*, 508 F.3d 773, 776-77 (5th Cir. 2007) (quoting *Quibodeaux v. Andrus*, 886 So. 2d 1258, 1261 (La. Ct. App. 2004)). The party that benefits from the servitude (here PH) is the "dominant estate," and the party burdened by the servitude (here CHS) is the "serviant estate." *See* LA. CIV. CODE art. 646. Louisiana further distinguishes between a "personal" servitude, which benefits a person, and a "predial" servitude, which benefits an interest in property. *Compare id. with id.* art. 639.

No. 13-30957

> When there is a contract, it is law between the parties and must be performed in good faith and enforced according to its terms. When, as here, the contract creates a conventional predial servitude, the mode of use of the servitude is regulated by the contract. If, however, the contract is silent on a non-essential question, like the mode of use, Louisiana's law of conventional obligations in general and predial servitudes in particular supplies the answer, filling in the blanks.

*Terrebonne Parish Sch. Bd. v. Columbia Gulf Trans. Co.*, 290 F.3d 303, 311 (5th Cir. 2002) (footnotes omitted). "One principle of servitude jurisprudence is that ambiguity in a servitude agreement must be construed in favor of the servient estate . . . ." *Id.* at 315 (citing LA. CIV. CODE art. 730 ("Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate.")). "Another well-established rule of servitude law is that the dominant estate owner . . . must not 'aggravate' the condition of the servient estate." *Id.* at 316 (citing LA. CIV. CODE art. 743 ("Rights that are necessary for the use of a servitude are acquired at the time the servitude is established. They are to be exercised in a way least inconvenient for the servient estate.")).

## II. THE DISTRICT COURT MOSTLY GOT IT RIGHT

### A. The District Court Correctly Permitted Motor Oil Use

In the district court, CHS argued that the Servitude Agreement applied only to transport of ethanol. The court found that transport of motor oil would

7

No. 13-30957

be permissible.  CHS appeals from that portion of the judgment below, but it does not seriously attack the factual underpinnings of the district court's ruling.[1]

The Court will first consider certain interrelated definitions in the Servitude Agreement:

> "<u>Plant</u>" shall mean that certain plant for the production of Product located on the Missalco Property, together with any future additions and alterations thereto.

> "<u>Product</u>" shall mean all ethanol produced by the ethanol production facility on the Missalco Property, as well as all other products manufactured, distilled, refined or otherwise produced through operation of the Business on the Missalco Property.

> "<u>Business</u>" shall mean the business activities and operations on the Missalco Property, including without limitation the business of ethanol production and other related grain processing activities, the production of other grain-based chemicals and processed commodities, and such other business activities and operations as may from time to time be carried out on the Missalco Property, <u>provided</u> that Missalco shall not exercise the Servitudes hereunder for other <u>unrelated</u> business activities and operations (i.e., non-grain processing) without the prior written consent of Company, which consent shall not be withheld unless such unrelated use unreasonably interferes with Company's business activities and operations at the Elevator.

Appellant's Record Excerpts ("RE") 45, 47 (emphasis in original).  Thus, the Plant produces the Product, the Product is what is produced by the Business, the Business is ethanol production and other unrelated business activities with the

---

[1]Although this was CHS's second argument on appeal, it is useful to address it first, as it informs the discussion of CHS's first argument.

No. 13-30957

prior consent of CHS, which consent shall not be withheld unless the unrelated business unreasonably interferes with CHS's business activities and operations at the grain elevator. The district court found factually that the use of the servitude for motor oil would not unreasonably interfere with operations of the elevator, and CHS does not seriously challenge that fact finding. This Court's review of the record shows that factual determination is not clearly erroneous. There was ample record evidence that motor oil is not materially different from ethanol in terms of its impact on operations of the elevator. CHS's complaint is not really about what would flow through the pipeline to the proposed dock, but rather the location of the proposed dock.

The Court agrees with CHS that the Conclusion of the Amended Opinion inadvertently expands this ruling past the confines of its logic – motor oil is no worse than ethanol – to allow *any* nonethanol product. The Court therefore reforms paragraph 9 of the Conclusion of the Amended Opinion to replace the language "non-ethanol products, including refined motor oil," with "refined motor oil." ROA.1973-74.[2]

---

[2]In an odd subset of this portion of its brief, CHS appears to argue that the district court correctly limited use of the pipeline to transport from the plant to the dock only, which would prevent use of the dock to deliver used motor oil to the plant. The Court agrees with PH that this direction issue was not raised below and that no extraordinary circumstances justify this Court considering that question in the first instance. *See In re Liljeberg Enters., Inc.*, 304 F.3d 410, 468-69 (5th Cir. 2002). The Court accordingly expresses no opinion on that

No. 13-30957

## *B. The District Court Correctly Allowed PH's Lessee to Use the Dock*

Section 15.1 of the Servitude Agreement provides as follows:

> 15.1   Nature of Agreement.   It is the intention of the parties hereto that this Agreement shall constitute both a personal and predial servitude agreement pursuant to and governed by Louisiana law.  The grant of servitude rights to Missalco hereunder shall also include the use of such servitude rights by Invitees of Missalco but only to the extent reasonable and necessary to perform the services for Missalco for which they were authorized to enter the Company Property.  Missalco shall not authorize any Invitee or other person to enter the Company Property except as reasonably necessary for Missalco to exercise its servitude rights for its legitimate needs in operating the Plant.   All personal servitude rights granted to Missalco hereunder shall be appurtenant solely to the Plant, are limited to the operation of the Business, and are not assignable, transferable or severable apart from a transfer of the Plant and, if the Missalco Property is ever subdivided, the Servitudes shall remain appurtenant to the Plant site and shall not pass with or be appurtenant to any subdivided portion of the Missalco Property not containing or serving the Plant.

RE 56.  The Servitude Agreement expressly defines "Invitee" to include "any lessee." RE 46.  CHS argues that the inclusion of use by invitees is limited by the phrase "but only to the extent reasonable and necessary to perform the services for Missalco for which they were authorized to enter the Company Property."   CHS contends that this language limits use by invitees to the common scenario in which operators of industrial facilities may lease a portion

---

subject.

10

No. 13-30957

of the facility to a service provider to assist the service provider in providing its services to the facility.

CHS loads too much meaning into section 15.1. As shown by the definition of "Invitee," the Servitude Agreement expressly contemplates that PH can lease its property. As the district court held, section 15.1 serves only to limit the lessee's access to CHS's property: that access is limited to "legitimate needs in operating the Plant." As discussed in the preceding section, *see supra* Part II.A, it would be unreasonable for CHS to withhold its consent to refining used motor oil. Thus, upon proper request by PH, Omega's refinery will constitute the "Plant," and by the terms of section 15.1, Omega will be entitled to access to CHS's property (to the extent authorized by the Servitude Agreement) for its legitimate needs in operating the Plant. The district court correctly held that section 15.1 does not preclude Omega as PH's lessee from using the proposed dock.

### *C. Post-Servitude Agreement Construction of the Barge Cover Station Cannot Deprive PH of Use of Its Servitude*

Section 9 of the Servitude Agreement provides:

Company, as owner of the Company Property subject to the Servitudes, expressly reserves the right to alter and modify any present and future improvements upon the Company Property, including the relocation of paths of access, and further reserves the right to develop and use the Company Property in any manner that

it deems fit, *so long as such development* does not physically damage any Servitude Works owned by Missalco or its Invitees, and *does not unreasonably limit or otherwise adversely affect any* existing or *future exercise of rights under the Servitude*, or the use, maintenance, repair, replacement or operating of the Servitude Works facilitating the use of the Servitude.

RE 53 (emphasis added). The barge cover station was built after execution of the Servitude Agreement. Both section 9 and the Louisiana Civil Code provide that PH's rights under the Servitude Agreement cannot be diminished by the later construction of the barge cover station. *See* LA. CIV. CODE art. 743 ("Rights that are necessary for the use of a servitude are acquired at the time the servitude is established.").

It is undisputed that the subsequent construction and use of the barge cover station altered CHS's use of its dock in two important ways: (1) it added a second "lane" of barge traffic; and (2) it doubled the volume of barge traffic through the Servitude Area, as each barge now must pass through twice to the barge cover station, once for uncovering and once for re-covering. The district court correctly held that under section 9 of the Servitude Agreement, the construction of the barge cover station cannot limit PH's exercise of its rights under the Servitude Agreement to construct a dock. It follows, then, as the district court held, that "[t]he potential for a dock proposed by PH to interfere with CHS' barge cover station operations does not constitute reasonable grounds

No. 13-30957

for CHS to withhold or delay its approval under the" Servitude Agreement.

ROA.1965 (Amended Opinion at 14).

### D. CHS Did Not Assume the Section 10.2 Obligation to Assist

Section 10.2 of the Servitude Agreement provides:

> 10.2  Permits.  Missalco shall obtain any licenses, permits or other approvals from any Governmental Authority that may be necessary to carry out the construction, maintenance and operation of any Servitude Works.  Company further agrees to use reasonable efforts to assist Missalco, at Missalco's expense, to obtain any necessary licenses, permits or other approvals from any Governmental Authority, including without limitation as may be necessary to construct or carry out Servitude Works.

RE 54.  Based on this provision, the district court imposed two different obligations on CHS: (1) CHS must assist PH in obtaining a permit to construct its dock (provided the other requirements of the Servitude Agreement are satisfied); and (2) CHS is prohibited from objecting to the Corps of Engineers that any proposed dock by PH would interfere with CHS's barge cover station operations.

The Court agrees with CHS that it did not assume the obligation to assist. Article 651 provides: "The owner of the servient estate is not required to do anything."  LA. CIV. CODE art. 651.  Comment c to that article provides "The owner of the servient estate may bind himself by a *personal* obligation to perform certain affirmative duties in connection with a predial servitude.  These

13

No. 13-30957

obligations may be heritable, but they are not transferred to successors by particular title without express stipulation to that effect." *Id.* cmt. c (emphasis in original). It is undisputed that CHS did not expressly stipulate to the obligation to assist in obtaining permits.

PH points to two comments suggesting exceptions to this principle for "incidental duties" or "accessorial" duties. *See* LA. CIV. CODE arts. 651 cmt. (b), 746 cmt. (b). The Court holds that an obligation to assist with permitting is not an incidental or accessorial duty. The Court therefore vacates the portion of the judgment requiring CHS to assist PH in obtaining the required permit from the Corps of Engineers.

The prohibition on objecting, however, stands on a different footing. The district court held, and we have affirmed, that PH is entitled under the Servitude Agreement to construct its dock notwithstanding interference with CHS's barge cover station operations. This right is independent of section 10.2. The trial court invoked section 10.2 only for the proposition that CHS could not do indirectly – by objection to the Corps of Engineers – what it could not do directly by withholding its approval. But that is the case independently of section 10.2. Moreover, under Louisiana law, "[t]he owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the

14

No. 13-30957

servitude." La. Civ. Code art. 748. Objecting to the Corps of Engineers on a basis prohibited by the Servitude Agreement would tend to diminish or make more inconvenient the use of the servitude. Accordingly, the Court affirms the district court's judgment that CHS cannot object to the Corps of Engineers or any other permitting process based solely on a proposed dock's interference with the operation of CHS's barge cover station.[3]

### E. The Unrecorded Site Visit Was Not Reversible Error

With the consent of all parties, the trial judge conducted a site visit after the bench trial. Although a court reporter was present, the reporter could not hear all of the judge's conversations at the site visit due to the ambient noise. CHS argues that this violated the Court Reporter Statute, 28 U.S.C. § 753(b), and requires reversal. Violations of the Court Reporter Statute are reversible only if prejudicial. *See Veillon v. Exploration Servs., Inc.*, 876 F.2d 1197, 1200 (5th Cir. 1989). If there were error here, it is harmless. First, the district court procured a recap of those communications immediately afterward on the record

---

[3]CHS claims this aspect of the trial court's judgment violates its free speech rights under the First Amendment. It does not violate the First Amendment for a court to enforce the parties' contractual agreement that limits speech. *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp.2d 575, 596 (D.N.J. 2009). CHS also suggests that this issue may not be ripe because the specific dock plans have not yet been submitted. The district court specifically addressed two plans submitted at trial, Options 1 and 2, modified to be in line with CHS's dock. This is sufficiently concrete for judicial review.

15

and under oath.  Second, the conversations simply restated what the witnesses had testified to during the trial.  Third, although the court noted in its Amended Opinion that it had conducted a site visit, it did not state that it relied on any off-the-record conversations during that site visit in making its factual findings.  *See* ROA.1952 ("Having considered the evidence and the testimony *adduced at trial*, the record, and the post-trial memoranda of counsel, and the law, the Court now issues its opinion . . . ." (emphasis added)).  Finally, nowhere in its Amended Opinion does the district court expressly rely on anything said off the record at the site visit.  CHS thus fails to show prejudice and is not entitled to relief under the Court Reporter Statute.

AFFIRMED IN PART, MODIFIED IN PART, REVERSED AND VACATED IN PART.